**UNITED STATES, Appellee,**

v.

**Ade George OYEGBOLA,
Defendant, Appellant.**

**No. 91–1152.**

United States Court of Appeals,
First Circuit.

Argued Jan. 9, 1992.

Decided April 2, 1992.

Rehearing and Rehearing En Banc
Denied May 7, 1992.

Robert E. Kenney, St. Paul, Minn., by Appointment of the Court, for defendant, appellant.

Duane J. Deskins, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BREYER, Chief Judge, ALDRICH, Senior Circuit Judge, and SELYA, Circuit Judge.

BREYER, Chief Judge.

The appellant, Ade George Oyegbola, pled guilty to transferring money that was not his from the Shawmut Bank, where he worked, to accounts that he controlled at other banks. 18 U.S.C. § 656. The district court sentenced him to serve 21 months in prison. He appeals, arguing primarily that the government breached its plea agreement, thereby entitling him to withdraw his guilty plea. *See* Fed.R.Crim.P. 32(d); *see also Santobello v. New York*, 404 U.S. 257, 262–63, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971). We find his arguments unconvincing and affirm his conviction and sentence.

## I

### Background

A. *The Two Count Indictment.* Oyegbola worked in Shawmut Bank's Mutual Funds Department. The Department oversees "suspense accounts"—accounts containing money that no one has claimed (money that eventually escheats to the state). The government obtained an indictment against Oyegbola, charging him with offenses based on the following conduct:

1. In March 1990, Oyegbola arranged for Shawmut to transfer $178,960 from a Shawmut suspense account called "Fidelity Unclaimed" to a specific, numbered account at the Marine Midland Bank, an account held in the name of "George Ade Oyegbola, doing business as Playtex PFD Group."

2. In August 1990, Oyegbola submitted to a Shawmut Bank official a form, purporting to be from Drexel Burnham Lambert, requesting payment of $156,400 from a Shawmut suspense account called "Atlantic Division Unclaimed" to a specific, numbered account at Bank of New England (BNE) which was registered to "Ade George Oyegbola, doing business as DBL (Drexel Burnham Lambert) Group Collections."

B. *The Plea Agreement.* The government and Oyegbola entered into a plea agreement. It reads, in relevant part, as follows:

1. Ade George Oyegbola will plead guilty to the two-count indictment ... and admit he misapplied approximately $335,360 from Shawmut Bank [*i.e.*, the $178,960 March transfer and the $156,400 August transfer].

2. The government will recommend that defendant Oyegbola receive a sentence at the lowest end of the applicable sentencing guideline range (which the government estimates to be 15–21 months). Please be advised that the sentence to be imposed is within the sole discretion of the sentencing judge and that the sentence imposed may be less severe or more severe than that recommended by the United States.

C. *The Attempted Transfers.* After Oyegbola pled guilty, the Probation Office conducted a pre-sentencing investigation. Its Presentence Report and the Addendum to that Report indicated that, in August 1990, when Oyegbola submitted the Drexel Burnham Lambert form to a Shawmut bank officer, for the $156,400 transfer, he also submitted two additional, similar forms requesting payment, by check, of an additional $191,985 from Shawmut suspense accounts to "DBL Group Collections Dept.," the name on Oyegbola's BNE account. Before Shawmut transferred the money, however, Oyegbola retrieved the forms and stopped the process.

D. *Sentencing Guidelines Calculation.* If the amount of money involved in Oyegbola's crime included only the $335,-

360 that Shawmut actually transferred in March and August, the relevant Guideline increases the base offense level of four by *ten* levels. *See* U.S.S.G. § 2B1.1(b)(1)(K) ("Larceny, Embezzlement, and Other Forms of Theft," with "loss" of $200,000–$350,000). If, however, the amount of money involved in the crime also includes the additional $191,985 that Oyegbola attempted to transfer in August, the applicable Guideline increases the base offense level by *twelve* levels. *See* U.S.S.G. § 2B1.1(b)(1)(M) ("loss" of $500,000–$800,000).

In deciding whether to raise the offense level by ten or by twelve levels, the district court followed the Guideline's application note concerning "a completed theft [$335,360] that is part of a larger, attempted theft [of the $335,360 plus the $191,985 from the two attempts, for a total of $527,345]." U.S.S.G. § 2B1.1, comment. (n. 2). That note directs the court to determine the offense level "in accordance with the provisions of [U.S.S.G.] § 2X1.1 ["Attempts"]." The "Attempt" Guideline says that the court should treat an attempt more leniently than a completed theft,

> *unless* the defendant *completed* all the acts the defendant believed necessary for successful completion of the substantive offense *or* the circumstances demonstrate that the defendant *was about to complete* all such acts but for apprehension or interruption by some similar event beyond the defendant's control.

U.S.S.G. § 2X1.1(b)(1) (emphasis added). In this case, the court decided that this "unless" clause (governing what we shall call "completed attempts") applied. It therefore treated Oyegbola's attempts to transfer $191,985 as completed attempts; it considered the amount of money involved in the crime to be $527,345, and it increased Oyegbola's offense level by the full twelve levels.

The court's finding that the attempts were "completed" is critical to its decision about the appropriate offense level. The Guidelines provide no leniency for a "completed" attempt. But, where the attempt is not "completed," the Guidelines mandate a

three-level reduction from the level provided for a completed theft of the same amount, which reduction, in this case, would simply off-set the additional two-level increase based on the $191,985 involved in the attempts. *Id.* & comment. (n. 4) (directing the court to apply the greater of "the offense level for the intended offense minus 3 levels" or "the offense level for the part of the offense for which the necessary acts were completed (or about to be completed but for apprehension or interruption)"); *see also* U.S.S.G. § 2B1.1(b)(1)(K), (M).

## II

### *The Completed Attempts*

■ Oyegbola argues that the court erred in finding that the "attempts" were "completed." He testified that he himself had terminated the attempts. He said that he retrieved the Drexel Burnham Lambert forms after he realized that the money in the relevant Shawmut suspense accounts was not really ownerless, but, in fact, belonged to Fidelity Investments. The problem for Oyegbola, however, is that the district court did not believe his account of his motives. Rather, the court believed the Probation Officer, who had interviewed Shawmut officials, and who testified:

> According to Catherine Kelso of Corporate Security with Shawmut Bank, it was after all three, both the second successful taking and the two attempts, that [the Drexel Burnham Lambert forms] were submitted to Mr. John Rexford who is the next person in line for processing these claims. The defendant handed all three pieces of paper to Mr. Rexford which was out of the ordinary, as far as the normal lines of processing the paperwork, and Mr. Rexford did become suspicious. It was subsequent to that—and Mr. Rexford asked some questions about these transactions, and it was subsequent to this that the defendant intercepted the paperwork relative to those two attempts.

The circumstances that the Probation Officer described led the district court to conclude, in the Guideline's words, that Oyeg-

bola "was about to complete" all acts "necessary for the successful completion of the substantive offense ... but for apprehension or interruption by some similar event beyond the defendant's control," namely Mr. Rexford's or other Shawmut employees' suspicions about the transfers. U.S.S.G. § 2X1.1(b)(1). We cannot say that the district court's conclusion that Oyegbola's actions "carrie[d] ... over the line from an [ordinary] attempt" and warranted the full twelve-level increase is "clearly erroneous." *See United States v. Zuleta–Alvarez*, 922 F.2d 33, 36–37 (1st Cir.1990) ("clear error" standard), *cert. denied*, —— U.S. ——, 111 S.Ct. 2039, 114 L.Ed.2d 123 (1991); *United States v. Sklar*, 920 F.2d 107, 110–11 (1st Cir.1990) (same); *see also United States v. Fox*, 889 F.2d 357, 360–61 (1st Cir.1989) (indictment of bank employee for "only one fraudulent loan does not insulate other loans from sentencing consideration" under U.S.S.G. § 1B1.3(a)(1)–(2)). Hence, the twelve-level increase was lawful.

## III

### *The Plea Agreement*

■ Oyegbola argues that the prosecutor breached the plea agreement. But, we do not see how that is so. The agreement clearly states that "the government will *recommend* that defendant ... receive a sentence at the lowest end of the applicable sentencing guideline range...." (emphasis added). *See* Fed.R.Crim.P. 11(e)(1)(B) (agreement to "make a recommendation ... for a particular sentence"). The prosecutor did precisely what the government promised to do. He recommended a sentence at the "lowest end of the applicable sentencing guideline range."

It is a closer question whether or not this is a case where the Government improperly sounded "the word of promise to the ear, but broke it to the hope." *See Santobello*, 404 U.S. at 262–63, 92 S.Ct. at 498–99; *United States v. Hogan*, 862 F.2d 386, 388 (1st Cir.1988); *United States v. Fortney*, 957 F.2d 629, 631 (8th Cir.1992). The agreement states that the government "estimates" the range "to be 15–21 months."

The government's estimate was wrong. With the twelve-level increase (and other adjustments that off-set one another), the Guideline range was 21 to 24 months.

Despite this misestimate, however, the government broke no promise. The agreement itself uses the non-promissory word "estimate" in describing the length of Oyegbola's possible sentence. It points out specifically that the sentence "imposed is within the sole discretion of the sentencing judge and ... may be ... more severe than that recommended." At Oyegbola's change of plea hearing, the sentencing judge specifically told Oyegbola that the court was "not obliged to follow the recommendation." *See* Fed.R.Crim.P. 11(e)(1)(B); *United States v. Garcia*, 954 F.2d 12, 17 (1st Cir.1992) (defendant "knew ... that the court ... 'would make[ ] a decision independently' [of the Rule 11(e)(1)(B) agreement] as to the proper sentence").

We note that the inclusion of the estimate makes the plea agreement somewhat ambiguous, for it does not say what will happen if the estimate proves wrong. It would have been preferable had the agreement spelled out what would occur in case of a misestimate. Nonetheless, we cannot say that the government violated the agreement or evaded it, for the government did not directly, or indirectly, break any specific promise that it made to Oyegbola.

Finally, we have no reason to believe the government was not telling the truth when it said that it estimated the applicable sentencing range would be 15–21 months. *Cf. Fortney*, 957 F.2d 629 (incorrect "rough estimate" in plea agreement did not show government breach or bad faith where government then knew of only three prior crimes and presentence report later revealed four more, changing criminal history category calculation). It was the Probation Office, not the prosecution, that investigated the "attempts." *See* Fed.R.Crim.P. 32(c)(1) (presentence investigation). At the sentencing hearing, it was the probation officer, and not the prosecutor, who raised the issue of whether the two uncompleted transfers were "completed attempts" un-

der the Guidelines. As far as the record reveals, the only information before the government on the matter when it made the plea agreement was a statement, in a report of an FBI interview with Oyegbola, that Oyegbola "admitted to wiring" the $335,360 in the two completed transfers and to "preparing the necessary documentation to do this to two more accounts." This single sentence is not enough to show that the 15–21 month estimate was made in bad faith or that the government was "lying in wait." It suggests only that ordinary, incomplete attempts had occurred, and they would not have raised the applicable sentencing range above the 15–21 month level. *See* U.S.S.G. §§ 2X1.1(b)(1), 2B1.1(b)(1)(M).

For these reasons, the judgment of the district court is

*Affirmed.*